**CITY OF ST. PETERSBURG v. MEYERS.**
No. 6337.

Circuit Court of Appeals, Fifth Circuit.
Feb. 6, 1932.

Rehearing Denied·March 4, 1932.

Fred T. Saussy, of Tampa, Fla., and Raney H. Martin, of St. Petersburg, Fla., for appellant.

James R. Bussey, Sam H. Mann, Jr., and McKinney Barton, all of St. Petersburg, Fla., and Chas. D. Gould, of West Palm Beach, Fla., for appellee.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

This appeal results from the instruction of a verdict against the city of St. Petersburg, Fla., in favor of Henry Meyers for a balance claimed under a contract to improve the city's waterfront. The errors assigned relate to striking on demurrer certain pleas of the city, the rejection of evidence offered by it, and the instruction of the verdict. Meyers sued in three counts: The first a special count on his written contract alleging performance and a balance due; the second a common count for work done and materials furnished; and the third a common count for money due on an account stated. The trial developed without dispute that the special contract existed, had been performed, and that the balance due on it had been stated. The contract was for the "dredging of two yacht basins and such other dredging as may be necessary to make the required fill shown in attached plan." It bound the contractor "to dredge a turning basin and build and complete a good, firm, and substantial fill and breakwater in strict accordance with the plans, drawings, profiles and specifications." The plans showed the two yacht basins and an estimate of 651,000 cubic yards for their excavation. The fill was shown as five neighboring sections requiring an estimated total of 1,300,000 cubic yards. These figures the contract stated to be mere estimates, and payment for the work was to be at a stated rate "for a cubic yard dredged from area indicated and deposited as shown on plans measured in place (fill measurement)," "Method of Measurement.—The material removed will be measured by the cubic yard in place by means of soundings or cross-sections taken before the work starts and after completion of the filling. The attached plan * * * is believed to represent accurately the existing conditions. It will be verified and corrected if necessary by sound-

ings taken shortly before dredging is begun. Monthly estimates will be based on the surveys of the fill. As soon as practical after the completion of the entire work the area filled will be thoroughly examined by cross-sections and the final estimate will be made." Kitchen, the city's director of public works, was to be in charge of the work as engineer, and was given authority to "settle all disputes or questions of doubt that may arise as to the meaning of the plans or any clause of the specifications or method of doing the work." Arbitration by three arbitrators was provided as to other matters. Monthly payments were to be made on the estimates of the engineer less 15 per cent., and full payment in ninety days after his final acceptance and estimate of the work. The contract does not provide that any estimate of the engineer shall be conclusive. No dispute exists about the dredging. Four of the five sections of the fill ran less than the original estimate. The fifth was estimated at 464,200 cubic yards, but was finally put at over 800,000 yards. A reduction of 34,000 yards was agreed to by the contractor and engineer, and a final estimate issued by the engineer which was accepted by the board of commissioners of the city, but not paid. In the light of these undisputed facts, we will examine the rulings complained of.

The second count for work done and materials furnished we will lay to one side as was done at the trial, because inconsistent with the special contract proved. We find no error in sustaining counts one and three against the demurrers thereto.

A plea of ultra vires, setting up the fact that a part of the fill was on land belonging to private citizens and the contract was therefore one to use the funds and credit of the city for the benefit of individuals contrary to the prohibition of the Constitution of Florida, art. 9, § 10, was properly stricken. The improvement of the city waterfront, the making of a harbor and a breakwater, with a public drive on the latter as shown by the plans, is upon its face a public work. The city charter expressly gives power to construct and maintain ship channels, breakwaters, and drives, and to make contracts in connection therewith. Special Act 1913, c. 6772, § 2 (d). And again in section 24 power is given to compel the owners of low ground to fill or drain the same, and on default the city may fill at their expense, making the cost a lien on the property to be enforced by assessment. The work proposed in this contract was within these powers of the

city. The disposal of the dredgings from the city's yacht basins on the land of others was not unlawful if consented to by them, and, if their land is benefited by filling and raising it, the city is not to be the loser, because the cost can be assessed upon the property and its owners. Another plea alleged that it was so assessed and the assessment resisted by the owners as exceeding the true cost by a bill for injunction to which the contractor was named a party; and that he not answering a decree pro confesso had been entered against him. This plea also was rightly stricken on demurrer, for a decree pro confesso entered by the clerk and not followed by a final decree is no estoppel; nor is it shown by the exhibited record that the contractor was ever served with process. Other pleas set up that the yardage to be paid for was to be determined by the survey made before the fill was started, and by that after the fill was completed, and that thus measured the final estimate was wrong by the sum of $53,226.76, the balance sued for. The contractor contends that the pay is to be measured by the yardage actually put into the fill ascertained in any way the engineer sees fit. The repetition ten times in the contract of the expression "fill measurement" settles the intent that yardage placed in the fill was alone to be considered. Under the title "Method of Measurement" above quoted, it is provided "the material removed will be measured by the cubic yard in place by means of soundings and cross-sections taken before the work starts and after completion of the filling. * * * As soon as practical after the completion of the entire work the area filled will be thoroughly examined by cross-sections and final estimate will be made." It is further provided: "Necessary bulkheads for confining and grading the materials, with necessary waste weirs, must be provided and maintained by the contractor without expense to the city." From these provisions, it appears that only yardage in the fill that remains there when the final examination is made is to be counted; the contractor having the duty to place and confine the dredgings. But we think the aim of the contract as to payment is to compensate the contractor for each cubic yard so placed and confined, and that, while the two surveys are the primary and controlling measure of the yardage, if either can be shown to be in fact wrong the error is not beyond correction. On the trial it appeared that almost twice the yardage originally estimated is claimed to have gone into the "assessment section" of the fill, although the original estimates proved about

right on all the other sections. Whether there was error in the first or final survey, or in the mathematical computation of their results, are questions not precluded by a fair interpretation of the contract. It is contended that the original survey of the fill was erroneous, in that it profiled in some places as the bottom what was really ooze or soft mud which ran out with the water as the fill was made. To the extent that this was true, we think that the contractor was entitled to a correction of the original survey. But there are possibly great engineering difficulties in ascertaining the true profile of the original bottom after the filling has been done. The survey, which was submitted to the contractor before he contracted with an invitation to inspect the bottom himself and with an offer to make other soundings if desired, is to be taken as presumptively correct, and to be disturbed only where clearly established to be wrong. In ruling upon the pleas, the court struck out the allegations concerning the yardage as measured by the first and last survey, but permitted to stand allegations that only the yardage stated was in fact permanently placed in the fill. Practically, the difference is slight. Under the pleas as allowed, the city by virtue of the contract could prove the yardage according to the surveys, when it would devolve upon the contractor to show error in them. We will not reverse the ruling on demurrer, but, as will appear, there was error in rejecting the city's evidence offered under the pleas.

We have been referring to the first count on the special contract. The third count, which was upon an account stated, was met by the statutory general issue, "Never was indebted as alleged." Comp. Gen. Laws Fla. 1927, § 4332, 4333, subd. 1. Special pleas claiming mistakes in the account in that the amount deposited in the fill was less than the amount stated because of duplications in the monthly estimates carried into the final estimate were stricken. An account stated anciently resulted when two merchants got together with their accounts, insimul computassent, and struck a balance; the law implying a promise, if not expressly made, that the balance would be paid. 3 Blk. Com. 162. Sometimes resort was had to equity to upset it for fraud or mistake, surcharging and falsification of the account being then in order. In modern times, an account stated arises from the mere rendering of an account of money transactions, with either a failure to object within a reasonable time, or an express approval by the other

party. But an account stated is now hardly more than an admission of correctness which puts the burden on the objecting party to show wherein it is wrong. "A settled account is only prima facie evidence of its correctness, at law or in equity; it may be impeached by proof of fraud, or omission or mistake." Perkins v. Hart, 11 Wheat. 237, 6 L. Ed. 463. "A stated account never gives to a party claiming under it the benefit of an absolute estoppel. It establishes prima facie the correctness of the items, and unless this presumption is overcome by proof of fraud, mistake, or error, it becomes conclusive; but that an account stated may be impeached for fraud, mistake, or error is well settled. The party impeaching it, however, has the affirmative of the issue and the burden of proof." Martyn v. Arnold, 36 Fla. 446, 18 So. 791; Withers v. Sandlin, 44 Fla. 253, 32 So. 829; Daytona Bridge Co. v. Bond, 47 Fla. 136, 36 So. 445. The facts pleaded were therefore a proper defense. The question is whether the general issue denies only that the account has been stated, or whether it suffices also to permit proof of errors and mistakes in it without specially pleading them. In the three Florida cases cited, the general issue was treated as sufficient, although no question of pleading was raised. In Wittich v. Allison, 56 F. 796, this court passed directly upon the point in a case from Florida holding the general issue to be sufficient. Courts in other states have held varying views. 1 C. J., Accounts, §§ 359, 368. We hold it not harmful error in Florida to reject special pleas setting up the particular errors and mistakes relied on, although there are manifest advantages in having the issues thus specially defined.

■ In the trial, the plaintiff proved not only that there had been a final estimate for the amount sued for made by the engineer and accepted by the city, but also that the amount had been reached in the following way: The owners of the private property had objected to the amount proposed to be assessed on them as being erroneous, and the engineer had called in Col. Youngberg, another engineer, who, after some investigation, proposed a reduction of 34,000 yards. The engineer and the contractor agreed to the result, none of the board of commissioners being present. A final estimate was then presented to the board, and accepted by it under this statement: "Final estimate dredging fill on waterfront Sixth Avenue to Thirteenth Avenue, (Assessment fill). Mr. Kitchen explained the property owners objected

to the amount of yardage; subsequently a complete check was made by Col. Youngberg, District Engineer, and he submitted a report substantiating the city's measurements." The District Judge was impressed that this was more than an account stated, and a compromise binding on all parties which could not be impeached unless for fraud, and he refused the offers of the city to prove that the computations under the surveys were erroneous and that the correction of the original profile by borings made since the fill as acted on by the engineer in making his final estimate was unreliable and mistaken, and that the true yardage was only what had been already paid for. The offers of proof were not very intelligibly made, but this was the intent of them. The plaintiff's evidence did tend to show as between the engineer and contractor the compromise of a dispute by mutual concessions which constitute a consideration for the agreement. Hennessy v. Bacon, 137 U. S. 78, 11 S. Ct. 17, 34 L. Ed. 605. But a contract of compromise was not sued upon, nor did the act of the engineer in making one bind the city. His authority extended only to making a final estimate according to the city's contract, and by no provision of that contract was his estimate made conclusive. The board of commissioners accepted the estimate made, thus admitting prima facie its correctness; but the proceedings before them do not indicate that they knew of any dispute with the contractor which had been compromised, or that with full knowledge they had ratified the compromise. They were told rather that a dispute with the property owners had been ended by upholding the city's contention. It follows that the evidence offered to show the true indebtedness under the contract ought to have been admitted, and that issue submitted to the jury.

■■ Interest was allowed against the city from September 6, 1927, a date ninety days after the final estimate, being the time fixed by the contract for final payment. Interest is not promised in the contract, and no statute of Florida provides for its payment by municipalities. Counties, as subdivisions of the state, are held not to owe interest not promised in their contracts. National Bank v. Duval County, 45 Fla. 496, 34 So. 894, 3 Ann. Cas. 457; Duval County v. Charleston Eng. & Const. Co. (Fla.) 134 So. 509, 512. This view has in some states been extended to municipalities, but more usually they are held on their business contracts to owe interest like private corporations. 2 Dillon

Munic. Corp., § 867. Although when interest is not expressly promised they must be put into default. McQuillen Munic. Corp., §§ 2099, 2635. The city's charter, Sp. Acts 1913, c. 6772, § 67, provides: "Before any contractor or his representative shall require a final settlement on any contract in which a bond is required, said contractor or his representative, shall make and file with the City Clerk an affidavit that all claims for materials and labor to the date of settlement have been fully paid." The declaration alleges that this affidavit was made and filed, but not until February 14, 1929, and such is the proof. The acceptance of the final estimate by the board of commissioners did not waive this requirement, nor is any other waiver pleaded or proven. The city was in no default, and the contractor not entitled to his money until the affidavit was filed. We think him entitled to interest after, but not before, that date. The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.