## WAGNER ELECTRIC CORPORATION v. HYDRAULIC BRAKE CO.

### No. U—97—M.

District Court, S. D. California, Central Division.

Nov. 15, 1935.

Edwin E. Huffman and R. W. Chubb, both of St. Louis, Mo., and Frank L. A. Graham, of Los Angeles, Cal., for plaintiff.

Williams, Bradbury, McCaleb & Hinkle (by Thomas H. Sheridan and Warren C. Horton), all of Chicago, Ill., and Andrews & Andrews (by A. V. Andrews, L. M. Andrews, and Mortimer A. Kline), all of Los Angeles, Cal., for defendant.

McCORMICK, District Judge.

This is a suit in equity brought by the complainant corporation to cancel a bonus agreement entered into by it and the defendant company. The relief is sought upon the broad ground that the consideration for the contract has failed. Specifically, it is alleged that because the defendant company has been acquired by Bendix Aviation Corporation, a holding and parent company of Bendix Brake Company, the principal competitor of plaintiff in the automobile brake industry, as a result there has been produced a continuing con-

flict of interests that has operated to bring about failure of the consideration of the bonus agreement.

Throughout this memorandum, plaintiff will, for brevity, be called "Wagner," defendant will be denominated "Hydraulic," and the Bendix entities will be referred to as "Bendix."

Defendant, a California corporation, is the owner and developer of United States and foreign patents for actuating vehicle braking equipment on automobiles. The inventions involved in this suit relate chiefly to hydraulic means of transferring the driver's effort from the brake pedal to the friction elements such as brake shoes or brake bands to bring such elements into engagement with brake drums attached to the wheels of a motor vehicle.

Plaintiff, a Delaware corporation, is a manufacturer of mechanical and electrical devices, and is a licensee of the defendant under its said patents. Its principal place of business is St. Louis, Mo. It maintains, at various other places throughout the United States, branches and service stations wherein it provides a dependable source of supply where there may be obtained its own products as well as defendant's patented braking systems, apparatus, and all spare parts and repairs, and convenient facilities where repairs and replacements thereof may be made.

The transactions between the suitors that are the genesis of this litigation commenced August 8, 1924, when a license agreement was entered into between them. Such contract is not involved in this action, except incidentally upon a counterclaim herein filed by Hydraulic against Wagner that will be considered toward the end of this opinion. The initial agreement is referred to in the pleadings as the AA contract. It was in effect until December 3, 1924, when it was supplanted by a more comprehensive license agreement on that date, referred to in the record as contract A. By this instrument, Hydraulic, in consideration of a royalty of 5 per cent. of the selling price of its "licensed equipment and parts thereof," and 7½ cents for each flexible hose utilized in such equipment, granted unto Wagner an exclusive license "to manufacture, use and sell apparatus and braking systems for motor vehicles," under the patents, applications for patents, and inventions of Hydraulic. These terms of the license agreement applied to all licensed equipment for initial and original installation in motor vehicles, which is characterized in the contract as "new licensee" business. The same terms are contractually required by the agreement as to sales of Hydraulic's "licensed equipment and parts thereof" from the various service stations of Wagner. Such sales are called "service sales." There were certain motor vehicle makers that had been previously licensed by Hydraulic to make and use its patented equipment in their original products. These concerns were described in the A agreement as "prior licensees," and their contractual licensed rights were recognized and preserved in contract A. Nevertheless, the exclusive license granted Wagner applied to any replacement and repair parts of the licensed equipments of such prior licensees; it being provided, however, that Wagner shall "not be required to pay any royalties on sales of licensed equipment or parts thereof to prior licensees, except that at least eleven and one-quarter cents (11¼¢) is to be paid on flexible hose of said equipment sold to prior licensees, and except that if Wagner's profits on sales to prior licensees, other than sales of licensed hose assemblies, exceed fifteen per cent. (15%), Hydraulic shall be entitled to one-half (½) of the excess but not to more than five per cent. (5%)."

Paragraph 3 of contract A further limited the exclusive license granted to Wagner by the following words: "The licensor reserves the right to license the Ford Motor Company, the General Motors Corporation, and the Packard Motor Car Company, to make for themselves, or to have made by any of their branches or subsidiaries for use only upon the motor vehicles made by themselves or by any of their branches or subsidiaries, the licensed braking equipment covered by this agreement."

In the A contract, Hydraulic agrees that it will continue to maintain a virile sales and engineering organization for the licensed braking equipment, and further agrees to conduct a program of national advertising relative thereto, and that without cost or expense to Wagner it will defend any infringement claims or suits asserted or brought against Wagner, and will indemnify Wagner against any damages or costs by reason of any infringement claims or litigation arising out of license agreements.

Upon the same day that the A agreement was made, Wagner and Hydraulic executed another and separate instrument,

known and described in the record as contract B. It is solely as to this last-mentioned agreement that Wagner bases its bill of complaint and demand for cancellation.

This writing provides for the payment of an additional 2½ per cent. by Wagner to Hydraulic on sales that are subject to royalties under the A contract, which additional amount is to be distributed and paid to the employees of Hydraulic "as additional and special compensation over and above the basic salaries" of such persons. It is further provided in the B contract that the total so distributed in any one year shall not exceed $150,000, and that until the net earnings of Hydraulic shall have equalled 12 per cent. on its then outstanding capital stock, it shall be required to pay not more than 50 per cent. of the receipts under the B agreement to its employees. It is admitted that the proceeds under this B contract have never exceeded $150,000 in any year, and that proceeds under the agreement have been distributed to members of the working staff of Hydraulic as bonuses.

The B agreement recites that Wagner, as licensee under the A contract, proposes to make a substantial investment, essential on its part to the carrying out of the purpose of the license agreement A, and that Wagner believes that it will secure greater protection for its investment by paying to Hydraulic the additional amounts and percentages over and above those stipulated in the A license agreement for the carrying out of the purposes of the contract.

There is an agreement by Hydraulic, similar to its engagement in the A contract, to use every endeavor to maintain a virile sales, engineering, and development organization for the purpose of advancing the mutual interests of the two contracting companies.

Provision is made in the B agreement for the employment of D. O. Scott as manager for Hydraulic. He has continued in such capacity through the entire period of time involved in this suit, and since the acquisition of Hydraulic by Bendix, hereinafter mentioned, has been also president of Hydraulic.

Paragraph 4 of the B contract in part reads: "It is contemplated at this time that in view of the valuable services heretofore rendered by the working staff of Second Party in the creation of a demand on the part of motor vehicle manufacturers for said Lockheed Braking Systems, that it is important to the securing of successful results by the above parties hereto under the agreement Exhibit "A" hereto attached, that Mr. D. O. Scott should continue in the active service of the Second Party as manager of its working staff. It is recognized, however, by the First Party that it rests solely with the Second Party to determine whether its personnel manager, Mr. Scott, shall or shall not continue in the service of the Second Party. It is agreed between the parties hereto, that in event of the termination by Second Party of the services of Mr. D. O. Scott as manager of its working staff at any time within the period of five years from the date hereof, the Second Party will appoint a successor to said D. O. Scott in its working staff, but it shall thereupon rest with the First Party as to whether or not such change in the personnel of said working staff will be conducive to producing results that will justify the First Party in continuing to pay to the Second Party the 2½% amount herein provided for."

And in paragraph 5 of the B agreement the following appears: "In the distribution of the special amounts to be paid to the members of the working staff of the Second Party, it is understood and agreed that the First Party hereto shall be consulted by the Second Party in the subdivision of said amounts and the views of the First Party given due and full consideration in the distribution to the end that the purposes of this contract may be properly achieved."

Concurrently with the B contract an agreement was entered into between D. O. Scott and Hydraulic under which Scott was to receive two-fifths of the amount that was to be paid to the working staff of Hydraulic under the bonus contract.

At the time that the A and B agreements were entered into, automobile manufacturers were generally using external brake band types of braking mechanism. Wagner did not make brake band mechanism, and there was therefore no royalty reported or chargeable thereon against it by Hydraulic. In 1926 and 1927, in combination with Hydraulic actuating equipment, Wagner did supply a 3-shoe brake and backing plates to Flint automobiles, upon which it reported and paid royalties to Hydraulic in accordance with the license contract in suit. This specific brake

assembly is shown to have been covered by patent rights of Hydraulic.

During the year 1926, the demand for internal means of braking increased in the motor vehicle industry. It appeared probable that such friction elements would supplant the earlier type. This changed attitude of the trade suggested a necessity for modifying the contractual relations between Wagner and Hydraulic because of increased cost in production of the licensed equipment in co-operation with internal friction elements in brakes. It was unascertainable at that time whether the new requirements could be profitably marketed under the license contracts.

There were therefore negotiations concerning the question of whether or not, under the agreements of December 3, 1924, royalties would be chargeable upon such internal shoes and backing plates co-ordinating therewith, when made and sold by Wagner with the hydraulic actuating instrumentalities.

As a result of these dealings, Hydraulic, by a letter to Wagner on March 22, 1927, specifically waived claim to all royalty under the license and bonus contracts on Wagner's sales of shoe assemblies, dust shields, frame fittings, tube fittings, and hose connections, on all future sales of such specified articles to any licensee of hydraulic actuating equipment. The parts covered by this waiver are further described in said letter and in a later one of May 3, 1927, as "miscellaneous fittings."

In the waiver letter the following language is used by Hydraulic: "There shall not be any commissions paid on miscellaneous fittings sold to any licensee in the future, unless we shall make demand in writing that payments of commissions shall be resumed on such miscellaneous fittings."

About March 20, 1930, Bendix Aviation Corporation acquired control of Hydraulic, and by August of the same year more than 95 per cent. of Hydraulic stock was owned by the Bendix Company, and the answer of Hydraulic in this case admits that more than 99 per cent. of the stock of the defendant corporation is owned by Bendix Aviation Corporation. This company also owns and controls substantially all of the stock of Bendix Brake Company, an Illinois corporation, and defendant's answer admits that Bendix Brake Company is a competitor of Wagner in the manufacture, sale, and promotion of braking mechanisms for automobiles and motor vehicles.

It is also admitted by Hydraulic that seven of its nine directors are directors or employees of Bendix Aviation Corporation or its subsidiaries, and that said directors of Hydraulic have control of the employment and discharge of Hydraulic's employees.

Although D. O. Scott, as manager of Hydraulic prior to the acquisition of it by Bendix Aviation Corporation, repeatedly urged the directors of Hydraulic to revoke the royalty waiver of March 22, 1927, they always refused to do so. However, shortly after Bendix had purchased Hydraulic, Scott, at an irregularly called directors' meeting, obtained consent of certain directors and other persons who were thereafter made directors of Hydraulic, to revoke the royalty waiver, and under date of April 18, 1930, as president and general manager of Hydraulic he by letter withdrew and discontinued the waiver. In this letter, Scott, as such corporate officer, demanded the payment of such commissions as were provided for in the contract of December 3, 1924, on all "fittings" delivered by Wagner on all future sales and commitments. Wagner did not comply with the demand of April 18, 1930, until the following year, when, under date of May 28, under protest, and without admitting any obligation to do so, it paid all royalties on "miscellaneous fittings," except on "service sales" from and including April, 1930, to and including March, 1931.

In June, 1931, Wagner, as a stockholder owning 50 shares of stock in Hydraulic, brought suit in a Michigan state court against Hydraulic to enjoin it, its officers, directors, and its main and majority stockholder, Bendix Aviation Corporation, from enforcing the terms and conditions of the licensing contracts that are involved in this suit.

The bill in the Michigan case charged in substance that Hydraulic was being maladministered by Bendix and the directors of Hydraulic for the benefit of Bendix Brake Company, a subsidiary of Bendix Aviation Corporation, to the impairment of Hydraulic's interests, and incidentally to the detriment of Wagner's interests as a stockholder of Hydraulic. Issue was joined in the circuit court of Wayne county, Mich., and after a hearing on the merits, findings of fact were made by the

court, followed by its decree dismissing the bill of complaint as without equity. Subsequently, on December 10, 1934, the Supreme Court of Michigan affirmed the decree. 269 Mich. 560, 257 N.W. 884.

Shortly after filing the Michigan case, to wit, on August 24, 1931, Wagner commenced this suit. On May 29, 1933, by an amendment to its answer, Hydraulic filed a counterclaim in which it alleged that Wagner had fraudulently concealed a substantial volume of its "service sales" to defeat Hydraulic's right to royalties that were due, owing and unpaid to it under the license agreements of December 3, 1924. It averred that it had discovered the concealment of its royalty rights subsequent to May 28, 1931, and until that time had been, without blame on its part, led by Wagner to believe that all royalties due under the license contracts had been reported and settled.

It also alleged in the counterclaim that the three agreements, AA, A, and B, are integral, and that if the B contract is canceled pursuant to the demand of Wagner's bill of complaint, then necessarily the other two agreements also fail and must be canceled. The defendant therefore demands (a) that all three agreements be annulled; and (b) that Wagner account to it for all sums due under the license agreements, and that Hydraulic have judgment against Wagner for such amount.

The complainant Wagner's claim to cancellation of the contract B may be briefly summarized upon the following acts and conduct of Hydraulic:

(1) In withdrawing the waiver of royalties by its letter of April 18, 1930.

(2) In making license agreements with General Motors Corporation and with Packard Motor Car Company that are discriminatory against Wagner and partial to Bendix.

(3) In promoting the interests of Bendix to the prejudice of Wagner with other prospective adopters of hydraulic braking equipment so as to defeat and destroy the purpose of the bonus agreement.

The clear wording of the waiver letter of March 22, 1927, precludes any question as to the right of Hydraulic to demand the resumption of royalties subsequently, on "miscellaneous fittings" that are sold by Wagner to the licensees of Hydraulic. The issue here is the motive that actuated Hydraulic to exercise such right.

The ineffective arguments of Manager Scott over a period of three years to induce the independent directors of Hydraulic to cancel the waiver quickly convinced the pretended directorate that was largely chosen from Bendix soon after Bendix acquired Hydraulic of the advisability of doing so. It is claimed that the cancellation policy was Scott's independent action and was not instigated by Bendix. It is undeniable that Scott has a personal financial interest in demanding as large commissions as justifiable under the bonus agreement, but the trade advantage that would accrue to Bendix by such a course was, in my opinion, what prompted the Bendix chosen Hydraulic directors to terminate the waiver. The benefit to Scott was merely incidental and secondary. The directors' financial interest and business loyalty lay principally with Bendix, one of Wagner's principal competitors in the automobile braking equipment business. The working staff of Hydraulic cannot divide their loyalty between Bendix, their real employer, and a strong competitor of their employer, and yet the chief consideration for the bonus agreement was that the mutual interests of Wagner and Hydraulic would be the primary concern of Hydraulic's working staff. The salaries of the working staff of Hydraulic are, in final analysis, paid by Bendix, while their bonuses in addition to their salaries, under the B contract, are paid by Wagner. It thus appears that an irreconcilable conflict of interests arises that utterly defeats the whole scheme and purpose of the contracting parties to the B contract. A failure of consideration for the payment of the bonus is thus necessarily produced, and entitles Wagner to cancel this part of its agreements with Hydraulic.

Bendix was engaged in the manufacture and sale of brake shoe assemblies, and the contention of Hydraulic is that the demand of April 18, 1930, constitutes a claim that all brake shoes sold by Wagner, whether patented or unpatented, that are to be associated with the hydraulic actuating equipment, must be reported as subject to royalty and royalty paid thereon to Hydraulic under the license agreements. This position would necessarily redound to Bendix's advantage and to Wagner's detriment, because it is improbable that customers for Hydraulic's braking equipment would buy unpatented shoe assemblies with royalty burdens added when such members of the brake equipment

could be purchased from Bendix without such loaded cost.

The corporate veil of Hydraulic cannot be interposed to obscure the actual effect of the royalty waiver withdrawal upon Wagner's rights, for it cannot be denied, under the record, that the dominant instrumentality and real party in interest in demanding resumption of royalties on "miscellaneous fittings" was not Hydraulic, but its owner, Bendix.

It is argued that even if the foregoing deductions are imperative, they are inoperative in this suit because of the application of the doctrine of res adjudicata by reason of the Michigan state courts' decisions in the stockholder's injunction suit that has been mentioned earlier in this opinion.

This contention is unsound. In Michigan, Wagner was a suitor, in its capacity as a stockholder of Hydraulic, against Hydraulic, while here Wagner sues in its corporate status, as an independent contractor with Hydraulic, under the bonus agreement. The applicable rule of law is succinctly stated in 34 C.J. 999, § 1419 (c), as follows: "A judgment against a person in one representative capacity, will not conclude him in a subsequent suit in which he appears in another and different representative capacity"; and the Supreme Court, in Troxell, Adm'r, v. Delaware, etc., R. Co., 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586, applied the rule in a damage action by the widow as administratrix of her deceased husband's estate under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51–59), notwithstanding she had lost the same claim in a former action wherein she sued as widow for the benefit of herself and children.

See, also, Cragin & Co. v. International S. S. Co. (C.C.A.2) 15 F.(2d) 263, 264, where the court said: "No judgment is binding even upon a party (and a fortiori upon a privy), except in the same capacity in which he was a party to it."

To the same effect is Carey v. Roosevelt (C.C.A.2) 102 F. 569.

Attention has been called to the reservation in the A contract of Hydraulic's right to license General Motors Corporation and Packard Motor Car Company respecting the licensed braking equipment covered by that agreement. There can be no doubt, under this reservation, of the right of Hydraulic to contract independently with these two motor vehicle manufacturers, notwithstanding its commitments to Wagner. But when the specific agreements that it made with the two companies are examined, it is clearly demonstrated that Bendix dictated the deals that were made for its own financial gain, and that they operate to the commercial prejudice of Wagner. It is true that to some extent Wagner acquiesced in contractual advantages that inured to Bendix under these contracts, but Wagner was in the position of taking what was given in order to salvage substantial benefits in these deals. Moreover, in consenting to such deals, Wagner expressly reserved all rights to contest Hydraulic's claims under the royalty contracts. Under such circumstances, its conduct is not such as to be tantamount to ratification. No estoppel arises that precludes it from questioning the fairness of the treatment that it received from Hydraulic in these matters or the necessary effects of the deals upon the bonus agreement.

The General Motors contract provides that Hydraulic may terminate it if "General Motors Corporation or any of its subsidiary companies adopts a new or changed model automobile equipped with hydraulic actuated brakes," and the instrument defines what it means by "new or changed model" as one "in which the braking equipment has been materially changed from an equipment which has heretofore been approved." It is therefore clear that the "new or changed model" refers to the braking appliances and not to the automobile itself.

The agreement then states that Hydraulic has approved the proposed braking equipment for the 1934 Oldsmobile that contains "friction shoes which shift their anchorage when the car changes its direction of movement, and one of which shoes carries the wheel cylinder and which is operated by connections from a Standard Lockheed Master Cylinder." This defines the Bendix shoe equipment and shows the binding and discriminatory requirement to employ Bendix shoe assemblies if General Motors are to install hydraulic brake actuation in their production.

The Packard Motor Car Company contract does not evince the studied effort to direct trade in brake shoe assemblies to Bendix to the same extent that appears in the General Motors agreement. Its tenor, however, does show the dominance of Wagner's chief competitor in the contractual activities of Hydraulic respecting

brake shoes that are to be assembled in Packard products in co-operation with Hydraulic's actuating equipment. One illuminating discriminatory feature of the Packard contract, in view of Hydraulic's interpretation of "braking systems" in the Wagner license A, under the counterclaim in this suit, is the use of the term "hydraulic operating system" when it was desired to favor Bendix brakes over other makes.

The sum of the incidents that have been discussed, to wit, the revocation of the royalty waiver and the making of the General Motors and Packard license contracts, as well as other attitudes and transactions of Hydraulic since Bendix acquired ownership of it, that are shown by the record, clearly establishes that the fiduciary relationship that reposes in the bonus contract B has been irretrievably and permanently destroyed, and that Wagner should, in good conscience, no longer be required to comply with its terms.

The B agreement owes its existence to the bonus idea. It is not inextricably connected with either of the license agreements AA or A. Its exclusive purpose was to secure joint advantage to Hydraulic and Wagner by giving employees of Hydraulic the incentive of personal participation in the success of the joint business. The terms of the B contract, and specifically the provisions of paragraphs 4 and 5 thereof that have been previously quoted, show that something more and different than the mere relation of licensor and licensee established by contracts AA or A was contemplated and intended by Wagner and Hydraulic when they executed the bonus contract B. It created a quasi partnership between them, and it is inconceivable that such a relationship can continue to exist and function properly or reasonably where one of the contracting parties is later acquired, owned, and controlled by an active competitor in the business of the other contracting party.

Equity should relieve the injured party in such a situation, because the consideration running to him has failed, and his remedy at law is wholly inadequate and incomplete.

We are finally brought to a consideration of the counterclaim filed herein by Hydraulic.

One of the grounds upon which Hydraulic seeks cancellation of all three of its agreements with Wagner is that Wagner has been guilty of "the fraudulent concealment" from Hydraulic of a substantial volume of "service sales" of "miscellaneous fittings." This charge may be dismissed with very brief mention. It has not been established. The dispute between Hydraulic and Wagner concerning the completeness and accuracy of reports of "service sales" that Wagner is required to submit under the license agreements relates to their respective understanding of the requirements of such contracts; and because Wagner took a different position from Hydraulic and rendered its accounts upon a different conception of contractual obligation than that contended for by Hydraulic is no reason for a deduction of fraud or bad faith on the part of Wagner. On the other hand, Wagner's contention that the receipt and acceptance by Hydraulic of the periodical reports of "service sales" constituted an "account stated," that operates as an estoppel against its claim to further payments under the license agreements for unpaid royalties, is also devoid of merit. Perkins v. Hart, 11 Wheat. 237, 6 L.Ed. 463; City of St. Petersburg v. Meyers (C.C.A.) 55 F.(2d) 810. There are certain items or "miscellaneous parts" that admittedly should have been reported and upon which royalties are due to Hydraulic under any construction of the license agreements. These are items that, for illustration, are described in Exhibit D–52 of the record under the heading, "Cylinder Parts not Included in Brake Billing." The aggregate of such omissions is not ascertainable from the present state of the record. It apparently will not be great when compared with the volume and magnitude of the business transacted between Wagner and Hydraulic. These omissions are attributable to unintentional errors in accounting and not to purposeful evasion of obligations.

The only other demand of the counterclaim that is shown by the record to have any merit is Hydraulic's contention that under the license agreements Wagner is obligated to pay royalties upon "service sales" of all items that fall in the category of "miscellaneous fittings" within the meaning of the contract. Nevertheless, Wagner's resistance to this demand can not be said to be arbitrary.

Contract A, after recitals of Hydraulic's ownership of specific patents and pending applications for patents, reads in part: "Licensor (Hydraulic) hereby grants

unto the Licensee (Wagner) a license under the Letters Patent aforesaid and under such patents as may be granted upon and from said applications for United States Letters Patent or any renewals or reissues thereof, and under any other United States patents or foreign patents now or hereafter owned or controlled by Licensor covering or relating to braking systems or apparatus for motor vehicles, to manufacture, use and sell apparatus and braking systems for motor vehicles under said inventions for the entire life of this agreement."

Paragraph 3 of the same agreement contains the following language: "It is understood and agreed that the Licensee undertakes to itself manufacture or to have manufactured for it and under its supervision and to supply and sell such licensed braking systems and parts thereof as may be required by the motor vehicle or other licenses of the Licensor."

And the following is found in paragraph 5:

"The Licensee agrees to render a report (under oath if requested by the Licensor) to the Licensor on or before the last day of each month, setting forth the total billing covering sales by the Licensee of the licensed equipment and parts thereof during the preceding month, which billing shall correctly represent the net sales prices and the total number of hoses for said equipment billed out during said month, and the total billing for vehicle manufacturers royalty under paragraph 6 hereof, and to accompany said report with payment to the Licensor of five per cent. (5%) of the amount of said billing covering sales, and in addition thereto the sum of seven and one-half cents (7½¢) on account of each flexible hose sold during said month. * * *

"It is also agreed that the Licensee shall not be required to pay royalties on sales of licensed equipment or parts thereof to prior licensees as above specified in the agreement, except as follows. * * * *"

And while the terms of the B contract are not regarded as essential to a proper construction of the A agreement as far as any right to royalty on "miscellaneous fittings" in "service sales" is concerned, it is noteworthy that when there is mention in that instrument of the entities upon which royalties are imposed they are denominated "Lockheed braking systems and replacement and repair parts in connection therewith (being the same braking systems, articles and things manufactured and sold by First Party (Wagner) under the agreement of even date herewith)" (contract A). The contract AA contains even a more comprehensive and inclusive designation of what is specifically intended to be the subject of royalties as between Wagner and Hydraulic under the license agreements.

It is clear to the court that when Wagner contracted to render monthly reports to Hydraulic covering total sales by Wagner "of the licensed equipment and parts thereof," and to accompany such reports with payment of royalties specified in the license instruments, it obligated itself to pay royalties or commissions upon any and all braking parts manufactured and sold by Wagner for use with or incorporation in the patented systems of Hydraulic.

Wagner contends that the term "licensed equipment and parts thereof" obligates it to pay royalties only upon patented instrumentalities and that "parts" characterized in the waiver letter of March 22, 1927, as "miscellaneous fittings," when not covered by claims of Hydraulic's patents, are not subject to royalties or commissions on "service sales."

I think this contention is not maintainable under the clear words of the agreements. It injects into the verbiage of the instruments of agreement something that is not there, and thereby materially alters and modifies the contracts. This would not be interpreting the instruments, but remaking or reforming them, which the court cannot do in this case. Moreover, if the parties had intended that only patented entities were to be subjected to royalties, they would not have used the words "and parts thereof." It would have been sufficient to have used the expression "licensed equipment." It is an established principle that in construing writings effect should be given to each and all words used if that can be done reasonably.

Wagner's argument as to the necessity of "miscellaneous parts" being patented before it is obligated to pay royalties thereon is founded upon a false premise that the counterclaim in this case is tantamount to a patent infringement suit by Hydraulic against it. No such situation is present in this action. And because of this, cases similar to Carbice Corporation

v. American Patents Corporation, 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819, and Radio Corporation v. Lord (C.C.A.3) 28 F. (2d) 257, are inapplicable.

Notwithstanding that the license agreements are regarded, ex proprio vigore, to be clear and without ambiguity as imposing upon Wagner the requirement of paying royalties upon "service sales" of "miscellaneous fittings," this conclusion also finds support when the conduct of the parties during the operation of the agreements is considered.

It would unjustifiably extend this opinion to mention all of the incidents and transactions that denote a "practical construction" by the parties in line with the court's conclusion on the meaning of the license contracts relating to the royalty obligations of Wagner. The correspondence between the two companies immediately leading to the waiver letter shows that "conventional parts," such as shoes, lining, shields, anchor pins, anchor brackets, etc., that go on the wheel assembly, were regarded and understood by both parties to be royalty items. There is significance also in the waiver letter itself in limiting the revokable removal of royalties on "miscellaneous fittings" to sales to licensees in the future. There is thus a foundation to infer that "miscellaneous fittings" had been regarded as subject to royalties theretofore, unless expressly restricted by limitations in the license contracts.

It is therefore held that there was no waiver of royalties that are required to be paid under the contracts for "service sales," except during the period from March 22, 1927, to April 18, 1930, and that as to such period of time the waiver of royalties on "miscellaneous fittings" applied to sales of such items to any licensee. Any "service sales" of "miscellaneous fittings" as such are specified in the letters of March 22 and May 3, 1927, that have been made by Wagner to others are subject to royalties.

I conclude this opinion by summarizing my decision of this suit as follows:

That the plaintiff is entitled to a decree canceling the 2½ per cent. bonus agreement, contract B, between it and the defendant company.

That such cancellation is and became effective as early as April 18, 1930, and that any and all obligations under the 2½ per cent. requirement of said contract B

since said date are canceled and annulled, and Wagner is entitled to recover all royalties or commissions paid to Hydraulic under said contract B subsequent to April, 1930.

That defendant is entitled to recover from Wagner on its counterclaim royalties under contracts A and B from the commencement of sales thereunder to March 22, 1927, upon all sales made by Wagner of backing plates or dust shields, brake shoes, lining, hose connections, anchor pins and brackets, and inlet fittings, that were sold by Wagner with the patented braking equipment of Hydraulic or for incorporation in such patented equipment of Hydraulic.

That defendant is entitled to recover from Wagner royalties under contracts A and B from March 22, 1927, to April 18, 1930, for all "service sales" of backing plates or dust shields, brake shoes, lining, hose connections, anchor pins and brackets, and inlet fittings, that were made to the public with the patented braking equipment of Hydraulic or to the public for incorporation in such patented equipment of Hydraulic, exclusive of any sales thereof made to licensees of Hydraulic.

That defendant is entitled to recover from Wagner royalties solely and exclusively under contract A from April 18, 1930, upon "Hydraulic's licensed equipment" and any and all backing plates or dust shields, brake shoes, lining, hose connections, anchor pins and brackets, and inlet fittings, that have been sold to all licensees of Hydraulic, and also to recover royalties solely and exclusively under said contract A upon all "service sales" of "Hydraulic's licensed equipment" and any and all backing plates or dust shields, brake shoes, lining, hose connections, anchor pins and brackets, and inlet fittings.

That Hydraulic is not entitled to cancellation of either contract AA or contract A, and that contract A is in full force and effect.

That no fraud or intentional concealment has been established against Wagner.

That this suit be referred to a special master to be hereafter designated for an accounting between Wagner and Hydraulic under all issues determined by this opinion.

That this opinion shall constitute findings of fact and conclusions of law re-

quired to be made under Equity Rule 70½ (28 U.S.C.A. following section 723), with such further findings of fact and conclusions of law as the court may deem it proper to make and file hereafter.

That neither party shall recover any costs at this time, but that costs of any reference or consequent thereto be reserved for future consideration by the court upon consideration of the final report of the special master.

Solicitors will present a decree in conformity to this opinion and under the rules of this court.

Exceptions allowed respective suitors upon all adverse rulings.